L. G. BRUCE, as Commissioner of the Freshwater Fish and Game Commission, v. C. E. MALLOY.

7 So (2nd) 123                                          En Banc
March 24, 1942

158

E. Snow Martin, for appellant.
H. E. Oxford, for appellee.

CHAPMAN, J:

On May 29, 1941, a Commissioner of the Department of Game and Freshwater Fish filed a petition in the County Judge's Court of Polk County, Florida, reciting that on the 27th day of May, 1941, on the waters of Lake Hancock, in Polk County, certain personal property and fishing devices unlawfully used for seining were seized, and when taken the nets were filled with fish and the nets attached to boats, but the operators escaped. The following property was seized by the Conservation officers, viz: Two 9 horse power Johnson Motors; one 16 foot seine boat; one 10 foot row boat, one 8 foot row boat; one 300 yard seine and one 2 gallon gas can.

The prayer of the petition was for an order of forfeiture authorized by Section 25 of Chapter 13644, Acts of 1929, Laws of Florida. The aforesaid devices were used unlawfully in taking fish from the waters of Lake Hancock, same being fresh water.

On May 29, 1941, the Honorable C. M. Wiggins entered an order on said petition viz:

"The foregoing petition coming on this day for hearing and the Court being fully advised in the

premises, It Is Now Ordered that the prayer of said petition be granted and that the illegally used fishing devices therein described be, and the same is hereby declared forfeited to the Commission of Game & Fresh Water Fish of the State of Florida; Provided, that this order shall not become final for a period of 30 days, during which time owners thereof shall be allowed to bring appropriate action for recovery of said illegally used fishing devices, if any rights they have in that respect."

On June 28, 1941, C. E. Malloy filed a pleading, identified by him as an answer to the petition filed by the Commissioner of the Department of Game & Fresh Water Fish. The answer describes certain personal property and asserts the ownership thereof to be in C. E. Malloy and the same was lawfully in his possession and that the facts did not authorize the court in entering the order of forfeiture under date of May 29, 1941. The seizing officers had been advised of the claim of ownership on the part of C. E. Malloy, and, further, that he had not been convicted in any court for the violation of fishing laws by the use of described devices in Lake Hancock on May 27, 1941, and that only the Criminal Court of Record of Polk County has jurisdiction to pass upon the forfeiture of said property; that a criminal prosecution was therein pending and not disposed of. The answer prayed for a vacation of the previous order of forfeiture. The County Judge denied the motion to vacate, but held that the 300 yards of seine should be eliminated from the order of forfeiture.

The orders as entered by the Honorable C. M. Wiggins, Judge of the County Judge's Court of Polk County, were reviewed by the Circuit Court on peti-

tion for certiorari, and on the 12th day of September, 1941, reversed the orders so entered, and restored to C. E. Malloy the property involved, and from said order an appeal has been perfected to this Court.

Section 25 of Chapter 13644, Laws of Florida, Acts of 1929, provides for a forfeiture of fishing devices unlawfully employed and found or being used in the fresh waters of the State of Florida. One of the provisions is viz: When any illegal net, trap or fishing device, or illegally used net, trap or fishing device is found in the fresh waters of the State of Florida and the owner of the same shall not be known to the officer finding the same, such officer shall immediately procure from the County Judge an order forfeiting said net, trap or fishing device to the Department of Game and Fresh Water Fish. It appears that the order dated May 29, 1941, entered by the County Judge's Court of Polk County was founded on the aforesaid provision of Section 25.

On petition for writ of certiorari to the circuit court, the trial judge was of the view that the owner of the fishing devices was known to the officers seizing the property used and to the judge of the county judge's court. It is upon this theory that the circuit court concluded that a conviction of the crime of unlawful fishing denounced by Chapter 13644, supra, should be obtained prior to the entry of an order of forfeiture of the fishing devices. The provisions of the order dated May 29, 1941, entered by the Judge of the County Judge's Court of Polk County, permitted or allowed the owner thirty days, from the entry of said order, to assert ownership of the property, but our study of the record discloses that the alleged owner, Mr. Malloy, did not assert ownership of the

unlawfully used fishing devices until July 10, 1941, or shortly prior thereto.

One of the questions for adjudication is whether or not the order of forfeiture, dated May 29, 1941, entered by the County Judge's Court of Polk County, of the fishing devices, unlawfully used on Lake Hancock, is authorized and a substantial compliance with Section 25 of Chapter 13644, *supra,* or is a conviction in the Criminal Court of Record of the owner of the fishing devices on the charge denounced by the Act in which these devices were by him used a condition precedent to forfeiture by the Criminal Court of Record under Section 25, *supra.*

The Legislature has the power to enact laws regulating fishing in the fresh waters of Florida for the use and benefit of the people. It is contemplated that such regulatory measures will advance the industry, develop its resources, and add to its wealth. The duty was on the Legislature to enact laws for the protection of fish in fresh water, as well as breeding places, and their migrations to and from their breeding places, and such measures usually are enacted under the police power for the benefit of the people. Chapter 13644 was designed and enacted to accomplish these several purposes.

Similar measures have been sustained by a previous ruling of this Court as expressed in Douglas v. Smith, 66 Fla. 460, 63 So. 844, when it was said:

". . . It seems evident therefore that the Legislature in passing Chapter 4558 did not regard the forfeiture of the seines, nets, etc., as the penalty for the violation of the law, but did regard the fine and imprisonment as such penalty. To hold that the provision for a forfeiture of the seines, nets, boats, etc.,

is the penalty provided by law for its violation, might make the act operate unfairly and unequally upon offenders. For if A, B, C and D were jointly engaged in the illegal use of nets, etc., and A happened to be the owner of these nets, seines, boats, etc., he would lose his property by forfeiture, whereas B, C and D would escape punishment entirely; for in the General Statutes of 1906 there is no provision for their punishment. See Chapter 3796 and 3797. We are constrained to hold therefore that the provision for forfeiture of seines, nets, boats, etc., in Section 3771, was not intended as a penalty in the original act, and cannot be so regarded in Section 3771 General Statutes of 1906. It was simply a method of breaking up illegal fishing. I Bishop's New Crim. Law, Sec. 816. The State in the exercise of its police power might, if it had seen fit, have provided for the destruction of such nets, etc. See Lawton v. Steele, 152 U. S. 133, 14 Sup. Ct. Rep. 499. . . ."

The case of Wilkinson v. Woodward, 105 Fla. 376, 141 So. 313, involved Section 25 of Chapter 13644. Certain fishing devices denounced by Section 25, supra, were seized by an officer of the Game and Fresh Water Department on Newnans Lake in Alachua County, and these several devices destroyed. A bill of complaint was filed seeking a restraining order against the confiscation and forfeiture of the traps, nets, boats and other described fishing devices, on the theory that the said property was seized and destroyed contrary to the due process provisions of the Constitution. This contention was held untenable and Justice Buford, speaking for this Court, in part said:

"The fish in the lake here under consideration come clearly within the protection provided by Chapter 13644, Acts of 1929. Section 25 of that Act authorizes the seizure and forfeiture of any trap, net or fishing device being illegally used in any of the fresh waters of the State of Florida. The Section provides the method under which the forfeiture shall be accomplished. . . .

"It is well settled that injunction will not lie to enjoin that which has already been done. The relief for that wrong, if any, is in a court of law.

"The complainants contend that Section 25 of Chapter 13644 is unconstitutional because of its derogation and violation of Section 16 of Article III of the Constitution, but the complainants in their brief have failed to point wherein this Section of the Act offends against the constitutional provision and we are unable to observe wherein such infirmity lies. . . ."

The holding of this Court in Wilkinson v. Woodward, *supra*, is in line with the weight of authority as expressed in 22 Am. Juris. par. 55, p. 708, viz:

"55. Forfeiture and Seizures.—. . . The general rule is that the constitutional requirements of due process of law does not forbid a state summarily to forfeit nets or other fishing appliances of small value which are used in illegal fishing. In the case of such nets or other fishing appliances which clearly appear to have been used in the unlawful taking of fish, the state may declare them to be nuisances; and the fact that it is possible for them to be used for legal purposes will not save them from summary forfeiture or destruction. Some cases take the position that summary destruction is lawful even though the articles

used are not declared to be a *nuisance;* others, however, take the view that if the property is capable of lawful use and is not declared by statute to be a nuisance, it may not be summarily forfeited. . . ." (Emphasis supplied).

The case of Lawton v. Steele, 152 U. S. 133, 38 L. Ed. 385, 14 Sup. Ct. 499, appears to be the leading case on the summary destruction of property unlawfully used authorized by statute. The State of New York enacted a statute having many of the earmarks of the one here involved, and the same was sustained by the United States Supreme Court, which in so doing in part said:

". . . So the summary abatement of nuisances without judicial process or proceeding was well known to the common law long prior to the adoption of the Constitution, and it has never been supposed that the constitutional provision in question in this case was intended to interfere with the established principles in that regard.

"Nor is a person whose property is seized under the Act in question without his legal remedy. If in fact his property has been used in violation of the Act, he has no just reason to complain; if not, he may replevy his nets from the officer seizing them, or, if they have been destroyed, may have his action for their value. In such cases the burden would be upon the defendant to prove a justification under the statute. . .

It is said, however, that the nets are not in themselves a nuisance, but are perfectly lawful acts of manufacture, and are ordinarily used for a lawful purpose. This is, however, by no means a conclusive answer. Many articles, such, for instance, as cards,

dice, and other articles used for gambling purposes, are perfectly harmless in themselves, but may become nuisances by being put to an illegal use, and in such cases fall within the ban of the law and may be summarily destroyed. It is true that this rule does not always follow from the illegal use of a harmless article. A house may not be torn down because it is put to an illegal use, since it may be as readily used for a lawful purpose, (*Ely v. Supervisors,* 36 N. Y. 297) but where minor articles of personal property are devoted to such use the fact that they may be used for a lawful purpose would not deprive the legislature of the power to destroy them. . . ."

Likewise in Lawton v. Steele, *supra,* a Legislature under the police power may enact laws authorizing (text 152 U. S. p. 136) :

". . . the destruction of a house falling to decay or otherwise endangering the lives of passers-by; the demolition of such as are in the path of a conflagration; the slaughter of diseased cattle; the destruction of decayed or unwholesome food; the prohibition of wooden buildings in cities; the regulation of railways and other means of public conveyance, and of interments in burial grounds; the restriction of objectionable trades to certain localities; the compulsory vaccination of children; the confinement of the insane or those afflicted with contagious diseases; the restraint of vagrants, beggars, and habitual drunkards; the supression of obscene publications and houses of ill fame; and the prohibition of gambling houses and places where intoxicating liquors are sold. Beyond this, however, the State may interfere wherever the public interests demand it, and in this particular a large discretion is necessarily vested in

the legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests. *Barbier v. Connolly,* 113 U. S. 27; *Kidd v. Pearson,* 128 U. S. 1. . ."

When the officers seized the property on Lake Hancock, the operators escaped and were not arrested. The property was in possession of the officers of the Game and Fresh Water Fish Department. The illegal use of the described fishing devices is by the Section 25 of Chapter 13644, *supra,* declared to be a nuisance, and the pertinent portions of said Section is viz:

"Section 25. Disposition of Illegal Fishing Devices. . . . When any illegal net, trap or fishing device or illegally used net, trap or fishing device is found in the fresh waters of the State of Florida, and the owner of same shall not be known to the officer finding the same, such officer shall immediately procure from county judge an order forfeiting said net, trap, or fishing device to the Department of Game and Fresh Water Fish. The State Game Commissioner may destroy such net, trap or fishing device, if in his judgment said net, trap or fishing device is not of value in the work of his department."

The property was seized on the 27th of May, 1941, and on May 29, 1941, a petition was presented to the County Judge's Court praying for a confiscation and forfeiture thereof. Testimony was taken in support of the petition and the order of May 29th entered declaring a forfeiture. The order became final thirty days after May 29, 1941. Thus we find each provision of the Act, *supra,* substantially complied with. If the owner of the property had desired to intervene and

assert ownership, he was allowed four days after May 29, 1941, or until June 2, 1941, so to do. We have not been favored with the citation of authorities supporting the order of the County Judge's Court of Polk County in this cause as made on July 10, 1941.

It was the view of the circuit court that in the absence of the showing of a conviction of the owner of the seized property a forfeiture and confiscation of the fishing devices, unlawfully used, could not be adjudicated by the County Judge's Court of Polk County. The fallacy of this reasoning is that the owner of the seized property escaped and was not apprehended by the officers, and this point was set at rest by the petition, testimony and order of the county judge's court dated May 29, 1941. If the operator of the seized property had been apprehended and taken into custody along with the fishing devices, then the conclusion of the circuit court to the effect that a conviction of the owner as a condition precedent to forfeiture under Section 25 would be tenable. There is nothing in the record to support the ownership or claim of ownership on the part of Mr. Malloy until the early portion of July, 1941. The order of forfeiture having been entered on May 29, 1941, the judgment was final and the Judge was without power to re-open the judgment as attempted on July 10, 1941.

It follows that the order of the circuit court dated September 12, 1941, is erroneous and accordingly is hereby reversed.

WHITFIELD, TERRELL and BUFORD, JJ., concur.

ADAMS, J., agrees to conclusion.

BROWN, C. J., and THOMAS, J., dissent.